# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 16, 2014

## STATE OF TENNESSEE v. CHARZELLE LAMONTEZ SWAFFORD

**Appeal from the Criminal Court for Davidson County**
**No. 2012-A-291      Cheryl A. Blackburn, Judge**

---

### No. M2014-00421-CCA-R3-CD - Filed April 2, 2015

---

After a shooting at a public housing complex, a jury convicted the defendant, Charzelle Lamontez Swafford, of one count of first degree (premeditated) murder, four counts of attempted first degree murder, each a Class A felony, and one count of employing a firearm during the attempt to commit a dangerous felony, a Class C felony. The defendant appeals, challenging the sufficiency of the evidence; the denial of a mistrial based on an emotional outburst from a witness; the trial court's decision to admit a recorded prior inconsistent statement as substantive evidence; and the trial court's decision to impose partial consecutive sentences at the upper end of the range. After a thorough review of the record, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Dawn Deaner, District Public Defender, and Jeffrey A. DeVasher (on appeal) and Chad Hindman and Laura C. Dykes (at trial), Assistant District Public Defenders, for the appellant, Charzelle Lamontez Swafford.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Jeff Burks and Megan King, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

On October 1, 2011, a shooting occurred in the apartment of Sharika Mallory. Twenty-year-old Dajuantae Moore was killed, and Taurus Williams, who was seventeen at the time of trial,[1] suffered multiple gunshot wounds. Three teenagers present in the apartment escaped without injury. Witnesses implicated the defendant, who was subsequently charged with one count of first degree (premeditated) murder, four counts of attempted first degree (premeditated) murder, and employing a firearm during the commission or attempt to commit a dangerous felony. The defense strategy at trial was to show that many of the witnesses, who had close relationships with each other and were members of a gang, might be motivated to falsely implicate the defendant at the behest of a higher-ranking gang member.

On the day before the shooting, several people who witnessed the crime were at Ms. Mallory's apartment. Ms. Mallory testified that some guests were playing cards and some were watching television. Ms. Mallory's children and those of her friend were in the apartment. Also present were Dajuantae Moore, who was the victim of the homicide (the "victim");[2] Taurus Williams, Danny Hall, Markeal Moore,[3] and Diajanne Coward, who were victims of the attempted homicides; and the defendant and an unidentified friend of his. Several of those present had close relationships: Markeal Moore and Taurus Williams were brothers, and the victim was Mr. Moore and Mr. Williams's uncle. Diajanne Coward was Markeal Moore's girlfriend, and Danny Hall was Mr. Moore's best friend. Ms. Mallory was acquainted with the group because Mr. Moore and Mr. Williams's mother lived next door to her.

The witnesses testified to the gang affiliations of the persons present. Ms. Mallory, Ms. Coward, and Mr. Williams testified that the defendant, the defendant's cousin Gerald

---

[1]While the trial transcript states that the trial took place in October 2014, the minutes and other documents indicate the trial took place in 2013.

[2]Because Dajuantae Moore, the homicide victim, shares a last name with Markeal Moore, one of the victims of the attempted homicides, we refer for the sake of clarity to Dajuantae Moore as the "victim" and to the other victims by their names.

[3]In the indictment, Mr. Moore's name is spelled "Markael," but we have chosen to use the spelling given at trial.

Farmer, and Mr. Moore were members of the Rollin' 40 Crips gang. Mr. Moore testified that Mr. Hall was also a member. Ms. Coward, Mr. Moore and Mr. Williams testified that Mr. Farmer was an "OG" in the gang, which was a higher rank than the others and which Mr. Moore stated was attained by committing violent acts.

At one point during the evening, an argument broke out between the victim and the defendant. Ms. Mallory testified that the argument began when the defendant was on the phone with Gerald Farmer. The defendant was naming the people at the apartment for Mr. Farmer, and he identified the victim as "Tae." The victim asked who was on the other line, and the defendant said, "[I]t's my cousin, it's cool." The victim then told the defendant, "[M]y name's not Tae, my name's Lil Nappy." Ms. Mallory testified that this was a disrespectful term for a member of the Rollin' 40 Crips gang. Because the subsequent argument was heated, Ms. Mallory asked the defendant to leave, and the defendant left with his friend. Ms. Mallory stated that Mr. Moore was not present during the argument.

Ms. Mallory testified that the defendant returned with two other men later that night. They wanted the victim to come out of the apartment, but Ms. Mallory did not let him go. Her impression was that they wanted to fight. Ms. Mallory testified that it was dark and she did not see them well, but one of the men with the defendant was big and one had dreadlocks. On cross-examination, she testified that she did not remember telling a detective that Gerald Farmer was one of the men with the defendant when he returned that night.

Ms. Mallory testified that Mr. Moore, Mr. Williams, the victim, her children, and her friend's children spent the night. The next day, Ms. Coward and Mr. Hall came over, and some of the group worked on fixing two motorized dirt bikes. Ms. Mallory testified that she and her friend went to get lunch for the children. The victim, Mr. Moore, Mr. Williams, Ms. Coward, and Mr. Hall remained in the house.

Ms. Mallory testified that she had only been gone around fifteen minutes when Ms. Coward called her, shouting, "Sharika, he killed Tae." Ms. Mallory returned as soon as she could and spoke with police. She identified the defendant from a photographic lineup and gave police the defendant's nickname, "C-Hell."

Ms. Coward testified that although she was there during the argument on the night of September 30th, she was not paying attention when it broke out and did not know the cause of the disagreement. She testified that Mr. Moore was not in the apartment the night before the shooting and that she herself did not spend the night and did not know if the defendant returned. Ms. Coward went back to the apartment the next day, and she estimated it was around 11:30 a.m. when the defendant returned. Ms. Coward, who was sixteen at the time of the trial in October 2013, testified that the defendant was alone and that the victim let him

in. According to Ms. Coward, the defendant then said, "[W]hat you say your name was?" The victim did not respond, and the defendant shot him multiple times. The defendant then began to shoot towards the kitchen, where Mr. Williams and Mr. Moore were standing. He returned to the victim and shot him again. The defendant then turned his attention to Ms. Coward and Mr. Hall, both of whom ran upstairs. Ms. Coward saw the defendant point the gun at them and heard it make three clicking noises. She and Mr. Hall went into a bedroom, and the defendant attempted to force the door open in his pursuit. She estimated that a total of twelve shots were fired. When Ms. Coward heard the door close after the defendant left, she went downstairs and saw that the victim was unresponsive and lying face down. Ms. Coward later identified the defendant in a photographic lineup.

The trial court decided to allow the jurors to take a break after the direct examination of Ms. Coward. Although the trial court had on two occasions admonished the spectators to refrain from offering "any expression of emotion" in front of the jury and had instructed trial counsel to discuss proper demeanor with their witnesses, Ms. Mallory, who was observing the trial after having given testimony, began to rail at the defendant:

> MS. SHARIKA MALLORY: You're a coward, and I hope they whip your b---- a--. I sure hope they get you.
> THE COURT: Ladies and gentlemen, go on out. Please, move on out.
> MS. SHARIKA MALLORY: I hope they get you, motherf---er. Do you know how many lives you done ruined with your b---- a--?
> [THE DEFENDANT]: Crazy. Crazy. (Inaudible.)
> THE COURT: I need the jurors to leave the courtroom.

Defense counsel moved for a mistrial, noting that all the jurors had been in the courtroom while Ms. Mallory was speaking. The trial court denied the motion and when the jury returned, the trial court instructed the members of the jury:

> Ladies and gentlemen, before you left the courtroom or while you were leaving there was some disruption in the courtroom. You are to disregard that completely. You cannot consider that for any purpose. Only the testimony of the witnesses from the witness stand and any evidence is what you are to consider. You are not to consider or base your opinion on any sort of emotion or sympathy, strictly on the evidence.

Defense counsel then cross-examined Ms. Coward. Ms. Coward denied telling a detective

-4-

that she could not see the shooter's face, then acknowledged having said she could not see the shooter's face "real good." She explained that she did not see the defendant's face well at the door but could see him as he entered the living room. She also acknowledged that she told detectives, "[T]hey said his name was C-Hell." She testified both that she did not know the defendant's nickname until after the other attempted homicide victims told it to her and that she "knew who he was as C-Hell." Ms. Coward clarified that she "knew exactly – I knew his face." She did not remember telling a detective that Mr. Moore was not present during the shooting, and she explained that he had not been there during the night before and that perhaps her "mind was not right at the time."

Ms. Coward had called 911 during the incident, and her call and a transcript were admitted into evidence. During the call, which was received at 12:32 p.m., Ms. Coward was distressed and told the 911 operator that there had been a shooting and that one victim was dead. She identified the shooter as "Charzelle." She testified that the disturbance which could be heard in the background on the 911 tape was created by a group of people confronting the defendant's sister, who happened to be outside.

Mr. Williams testified that he was present the night before the shooting when the defendant and his friend were there. He did not pay attention to the argument between the victim and the defendant, but he was aware that Ms. Mallory had asked the defendant to leave because of an argument. He testified that he, Mr. Moore, Mr. Hall, and the victim all spent the night, but he did not recall the defendant returning to the apartment that evening. In the morning, Mr. Williams used a dirt bike to pick up Ms. Coward. Mr. Williams testified that the defendant returned early, long before lunch. He confirmed Ms. Coward's testimony that the defendant knocked on the back door, and the victim opened it. The defendant entered and shut the door behind him before pulling out a gun. He said something to the effect of "What did you say, what was you saying[?]" and then tried to shoot the gun. It clicked twice but did not fire. The victim began to run to the front door, and the defendant then cocked his gun and shot the victim. He turned around and shot Mr. Williams, who was in the kitchen. The defendant pointed the gun at Mr. Williams's brother Mr. Moore, but Mr. Williams jumped in front of his brother, and they both fell to the ground. The defendant then chased Ms. Coward and Mr. Hall upstairs. Mr. Williams ran across the street and kept going until he was unable to move. He suffered gunshot wounds to his back and arm, and his arm had to be repaired with a steel rod. He was hospitalized for one month. Mr. Williams identified the defendant from a photographic lineup while still hospitalized on October 6, 2011. Mr. Williams did not remember telling a man at the scene that he did not know who had shot him, and he did not remember telling Detective Matthew Filter that the argument was over the term "Nappy." His testimony at trial was that he was in the living room and not paying attention to the argument when it occurred and that he therefore did not have personal knowledge about the source of disagreement. Mr. Williams had been adjudicated delinquent

for theft of over $10,000.

Mr. Moore testified that he was not present for the argument the night before the incident but that he had been called about it in hopes that he could settle the disagreement between his fellow gang member and his uncle. Mr. Moore testified that he, the victim, Mr. Williams, and Mr. Hall spent the night in the apartment and that Ms. Coward came over the next day after lunch. Mr. Moore testified that he looked out the window and saw the defendant walking back and forth outside. The defendant then knocked on the back door. Mr. Hall looked out the window and told the occupants that it was the defendant, and Mr. Moore told Mr. Hall not to open the door because Ms. Mallory had asked them not to let anyone in. The victim nevertheless opened the door. When the defendant entered, he first asked who was in the house, then pulled out a gun and said something to the effect of "What's up now[?]" The victim replied, "I'm supposed to be scared." The defendant tried to shoot, but the gun did not fire. He then "did something" to the gun and this time shot the victim "probably" more than five times. The defendant then turned to the kitchen and shot Mr. Williams approximately four times. Mr. Moore continued to stand in the kitchen. The defendant chased Ms. Coward and Mr. Hall upstairs. Mr. Williams ran out the back door, and Mr. Moore checked on the victim. The defendant ran out the back door. Mr. Moore identified the defendant from a photographic lineup on October 3, 2011. He acknowledged that he was currently incarcerated and charged with two aggravated burglaries and was hoping his testimony would help his case. Mr. Moore testified that he did not recall seeing Mr. Farmer with the defendant at the apartment on the day of the shooting. He did not recall telling Detective Adam Weeks that he saw Mr. Farmer there. During the testimony of Detective Weeks, Mr. Moore's video recorded statement, in which he apparently nonverbally agreed that he saw Mr. Farmer outside on the morning of the shooting, was admitted as substantive evidence.[4]

The final victim, Mr. Hall, was likewise incarcerated on charges unrelated to this case. Mr. Hall testified for the State reluctantly. He stated that he was not at the apartment on September 30, 2011, and that he was there on October 1, 2011, but did not recall witnessing any event on that day. Mr. Hall responded in the negative when asked if something might have happened that he did not recall. He then testified that he recalled talking to a detective and that he described the event he had witnessed for the detective. When asked if he told the detective what he knew, however, Mr. Hall testified that he had only told the detective "what I heard." When asked what he told the detective, Mr. Hall replied, "You know." The defense objected at this point to further testimony because Mr. Hall had indicated that the statements he made to the detective were based on hearsay. During a bench conference, the State indicated that it wished to use the prior recorded statement as substantive evidence

---

[4]This recording was not included in the record on appeal.

under Tennessee Rule of Evidence 803(26). Mr. Hall acknowledged that he had spoken to a detective, that the interview was recorded, and that he had recognized his own voice during a previous review of the tape. During a jury-out hearing, the defense argued that the statements were not inconsistent because Mr. Hall was claiming a lack of memory and that they were based on hearsay according to the witness. The trial court ruled that the statements were made under circumstances indicating trustworthiness and that those portions of the statement which were inconsistent with the witness's testimony that he did not recall any event on that date and that he did not witness anything but was only repeating what others had told him could be introduced as substantive evidence. The recording was not made an exhibit.

In the portions of the recording played for the jury, Mr. Hall told police that they were fixing bikes when the defendant came over. Mr. Hall stated that "they told me that the one that got killed . . . they had had words or something" and that the conflict was over the name "Nappy." Mr. Hall told police that he, Ms. Coward, Mr. Williams, Mr. Moore, and the victim were at the apartment when the defendant came. Mr. Hall told police that the people at the apartment told him not to open the door but that the victim decided to open it. The defendant asked the victim, "What's your name?" and the victim responded, "Aw, what, you gonna shoot me?" He stated that the defendant pulled the trigger twice and it clicked; then he cocked it and shot the victim in the back. He stated that the victim "fell in front of me." The defendant then pointed the weapon at Mr. Williams and shot. Mr. Hall told police that he thought the defendant was also trying to shoot Mr. Moore. The defendant followed him and Ms. Coward upstairs, pointed the weapon at Mr. Hall's face as Mr. Hall was opening a window, and the weapon clicked because it was out of bullets. He told police Ms. Coward did not go into the same bedroom he went into.

On cross-examination, Mr. Hall reiterated that his recorded statements summarized what he had heard from others and not what he had witnessed. He stated that he did not see the defendant shoot anybody. He ultimately acknowledged being present for the shooting but stated he did not know who did the shooting because he was "high." "Everybody" told him to say that the defendant did it. Detective Curtis Hafley testified that Mr. Hall identified the defendant from a photographic lineup.

Officers Raymond Flaherty and Carroll Fondaw responded to the scene, where they found the victim lying dead and face down in the apartment and Mr. Williams injured across the street. Officer Fondaw helped tend Mr. Williams and saw a teenaged girl who was hysterical. She gave him the suspect's nickname, which he conveyed to detectives. Lynn Mace, Officer Johnny Lawrence, and Sergeant Nathaniel Ward collected physical evidence from the scene. Ms. Mace, a crime scene investigator associated with the police department, collected nine .40 caliber Smith & Wesson bullet casings, including one recovered from the

victim's clothing when he was turned over, and three projectiles, one from a wall, one from under the couch, and one on a table under a television. She collected three cell phones from the victim's body. Ms. Mace testified that the inside of the apartment was dark because there were not many windows. Sergeant Ward collected fingerprints and took the evidence from Ms. Mace to the secure property room. Officer Lawrence took photos with a panoramic camera and went back to the scene on October 6, 2011, after two additional "strike" marks, gouges created by bullets, were discovered in the home. He recovered another projectile by taking apart a kitchen cabinet and took it to the secure property room. He acknowledged there were no strike marks found on the floor under the victim.

Detectives Matthew Filter, Adam Weeks, Curtis Hafley, and Ryan Lockwood testified regarding the investigation into the shooting. Detective Filter spoke with Ms. Mallory and asked Detective Hafley to create a photographic lineup, from which Ms. Mallory and Mr. Williams identified the defendant. The fingerprints found at the scene were matched to Markeal Moore and to a neighbor. Detective Filter also collected the physical evidence recovered during the autopsy and a projectile taken from Mr. Williams. Detective Filter acknowledged that the inside of the apartment was dark. He testified that law enforcement were not able to locate Mr. Moore for two days after the shooting. He also testified that Ms. Mallory told him that Gerald Farmer came to her house with the defendant after the argument and that Mr. Williams had told him the argument was over the term "Nappy." Detective Weeks testified that Ms. Coward and Mr. Moore identified the defendant from the lineup. The defendant was arrested at the home of Delilah Scales on October 7, 2011, by Detective Lockwood.

Dr. Thomas Deering testified regarding the autopsy, which had been performed by a forensic pathologist who was no longer employed with the medical examiner's office. He testified that the victim suffered ten projectile wounds. Eight of the bullet paths traveled from the back of the victim to the front, one traveled from front to back, and one went across his body. In six of the wounds, the projectile exited the victim's body, and four projectiles, including three bullets and one bullet casing, were recovered from the body. A bullet, shell casing, and the accompanying primer cap were recovered from the victim's shoulder, where three wounds were located in close proximity. Dr. Deering testified that a casing would generally remain with the weapon and not end up as a projectile. The shots were fired from an indeterminate range, which Dr. Deering testified meant that there was no soot or stippling noted. He testified that the absence of soot or stippling meant either that the weapon was approximately four feet or further from the victim or that clothing or another barrier prevented the soot from reaching the body. He testified that the victim died of multiple gunshot wounds and that the death was a homicide.

Lou Anne Corcoran took physical evidence collected by law enforcement to the

Tennessee Bureau of Investigation for testing. Agent Kevin Warner determined that eight of the recovered bullets – one from Mr. Williams, three from the victim's body, three from the crime scene, and one recovered from the body bag – had been fired with the same firearm. Nine recovered casings were fired from the same weapon. These were all .40 caliber Smith & Wesson casings.

Agent Warner testified regarding the unusual finding that a casing had entered the victim as a projectile. Agent Warner believed this evidence resulted from a nine millimeter Luger cartridge casing being loaded into a .40 caliber weapon and being struck by a .40 caliber bullet which was loaded subsequently, causing both the nine millimeter cartridge and bullet to fire from the barrel of the gun. Agent Warner testified that a primer from a cartridge case was recovered from the victim's body. Typically, a fired primer cap would have an impression from a firing pin on it, but this one had no marks. The cartridge case recovered from the victim's body was a nine millimeter Luger casing, and this casing showed rifling, which established that the casing itself had been fired from the same firearm as the .40 caliber bullets. A nine millimeter Luger bullet was recovered from under the television, and this bullet showed none of the rifling which should have been present in a bullet which had fired through the barrel of a pistol. The bullet recovered from the victim's upper arm had an impression on the nose of it that was consistent with having hit the case head of a nine millimeter Luger cartridge. Agent Warner testified that if a nine millimeter Luger casing were loaded into a .40 caliber weapon with .40 caliber cartridges, it would slide into the barrel from the chamber and would not fire. If a .40 caliber cartridge were then loaded behind it, the .40 caliber bullet would hit the nine millimeter casing, detonating the primer and causing the casing itself to expand and fire out of the barrel. Because the bullet itself would be smaller than the diameter of the barrel, it would be expelled from the barrel without contacting the rifling. Agent Warner testified that he conducted a test by loading a nine millimeter cartridge and then a .40 caliber cartridge into a .40 caliber weapon. He conducted the test twice; during one test, the weapon became disabled, and the other test confirmed his theory that the evidence in this case resulted from a nine millimeter Luger cartridge casing being loaded into a .40 caliber weapon and being struck by a .40 caliber bullet which was loaded subsequently.

The State sought to establish the defendant's presence around the scene of the crime through telephone records in addition to witness testimony. Gennie Douglas testified that she had dated the defendant for a period of months prior to the shooting. During their relationship, she had provided the defendant with a cellular telephone. Although they were no longer dating at the time of the shooting, the defendant still had the phone, and she continued to contact him by using it through October 1, 2011, and beyond that date. The number that Ms. Douglas testified the defendant was using was the same number listed on the arrest report completed by Detective Lockwood.

Cynthia Chavez, an employee of a company that handles Cricket's legal compliance, introduced the records for the phone that the defendant was using. She explained that the records indicated that the defendant's phone received three calls between 12:00 p.m. and 12:07 p.m. on the date of the incident and that all of these calls used the antenna at cell site 70. The defendant's phone also received a call from the phone number Gennie Douglas was using at 12:22 p.m., and this call was also directed through the antenna at cell site 70. At 12:37 p.m., the phone received another call. Ms. Chavez testified that the call came through site 70, although the records admitted into evidence show that it was from site 123. She testified that the next call the defendant received had a "#11," which meant that the call was forwarded. The records show that no further calls originated with the defendant's number through October 6, 2011, and that all incoming calls had the "#11" designation, meaning that all of them were being forwarded to another number.

Detective Andrew Vallee testified further about the phone records as an expert in law enforcement use of communications records, and he gave a power point presentation to the jury. He testified that the crime scene was in the middle of the area of coverage provided by sector 3 of cell site 70. The antenna is located 0.339 miles from the crime scene. Detective Vallee went to the crime scene and used cellular engineering mode to ascertain that he was connecting to cell site70 when he tried to place a call at the crime scene. The defendant's phone received a call from Ms. Douglas's number at 12:22 p.m. that lasted approximately three minutes and connected to cell site 70. The defendant's phone then received a call at 12:38 p.m. connecting to sector 2 of cell site 123. A map in the presentation showed that site 123 was located close to site 70 and about 1.17 miles from the crime scene. Detective Vallee testified that this call was not answered. Detective Vallee testified that the phone never connected to another cell site, which indicates that it was turned off, destroyed, or was unable to connect to a network. The subsequent calls received at the number were forwarded to another number, but Cricket did not have information on the number to which they were forwarded. Detective Vallee testified that the defendant's phone had a total of thirty-one calls either going to or coming from Ms. Douglas's number between September 30 and October 1, 2011. Additionally, six calls were made to or from a phone number that Norman Robinson, the director of security for the State Trial Courts, testified was used by him to contact the defendant's mother, Sherrie Swafford. Detective Vallee acknowledged that the phone records were not as accurate as GPS data and that they indicated the whereabouts of a device and not a person.

The defendant introduced the alibi testimony of Delilah Scales, who was the defendant's stepmother. Ms. Scales, who lived in Murfreesboro, had taken her sister to work on the morning of October 1, 2011, at 4:00 or 4:30 a.m. and was leaving to run errands at 7:00 or 8:00 that morning, which she recalled because it was the first of the month and she had bills to pay. When she stepped out of her house between 7:00 and 8:00 a.m. that

morning, she saw the defendant on her porch. She ran errands while the defendant stayed in her home with her youngest son. She then picked up her sister, and they arrived back at her house. The defense introduced records showing that Ms. Scales's sister was at work around 5:00 a.m. that morning and left around 10:30 a.m. The defendant was still present when Ms. Scales returned with her sister, and the four began to play a card game. The defendant was not upset or acting strangely. They played for approximately two hours, and the defendant was still there at 1:00 p.m. The defendant never left her sight during this time. After the game, the defendant and Ms. Scales's son walked to the store. On cross-examination, Ms. Scales testified that she did not know who had brought the defendant to her residence or how he had arrived. She did not ask him because it was not unusual for him to appear on her porch when he was arguing with his mother. She also testified that the defendant and Mr. Hicks, who lived with her, had an amicable relationship, and she did not recall telling detectives that they did not. She acknowledged that the defendant asked her for a phone when he came to her house and that she gave him one. Ms. Scales testified that the defendant's brothers came to her house from Nashville later that night but denied telling officers that the defendant came with them.

In rebuttal, the State called Sergeant David Haywood, Detective Filter, and Detective Vallee. Sergeant Haywood testified that Ms. Scales had told him that her son, Antonio Scales, brought the defendant to her house on October 1, 2011. Detective Filter testified that Ms. Scales told him the number of the phone she had given the defendant. He acknowledged that Ms. Scales had always been consistent that the defendant was at her home at the time of the crime. Detective Vallee testified that the records for the phone which Ms. Scales said she had given the defendant indicated an outgoing call on September 27, 2011, which was not completed, an incoming call on October 1, 2011, at 1:54 p.m. that did not connect to a cellular site, and an outgoing call on October 2, 2011, at 11:55 a.m. that also did not appear to be a valid call. He explained that the call might not be valid if the device was powered off.

During deliberations, the jury requested to listen to the recorded prior inconsistent statement of Mr. Hall again. The trial court instructed the jury that they were not to give the evidence extra weight simply because it was recorded but permitted the jury to listen to the tape again, in part due to the poor quality of the recording.

The prosecution specified that the dangerous felony it would be relying on in the firearms offense was the attempted first degree murder of Mr. Williams. The jury convicted the defendant as charged on all counts. The trial court imposed an automatic life sentence for the first degree (premeditated) murder and a six-year sentence for the firearms offense, which by statute was to run consecutively to the attempted murder of Mr. Williams in Count 3. The trial court found that the defendant had a prior history of criminal behavior in addition to that necessary to establish the range, that he possessed or employed a firearm

during the commission of the offense, and that he had a juvenile adjudication for an offense, aggravated assault, that would constitute a felony if committed by an adult. Finding that no mitigating factors applied, the trial court imposed maximum sentences of twenty-five years for each of the attempted first degree murders. It found that the defendant was a dangerous offender with little or no regard for human life and no hesitation about committing a crime where the risk to human life was high. In making this finding, the trial court cited to the evidence that the victim was shot ten times, almost entirely from the back, and that the defendant also attacked four persons with whom he did not have a dispute. The trial court then found under *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995) that the aggregate term of imprisonment reasonably related to the severity of the offense and that it was necessary to protect the public from further criminal acts, again citing to the defendant's crimes against those who were "just bystanders there." The trial court ordered Count 2, charging the attempted first degree murder of Ms. Coward, and Count 3, charging the attempted first degree murder of Mr. Williams, to run consecutively to each other and to the life sentence. Counts 4 and 5, charging the attempted murders of Mr. Moore and Mr. Hall were to run concurrently with Count 3, for an aggregate sentence of life plus fifty-six years.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence. This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). When the defendant challenges the sufficiency of the evidence, the appellate court may not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *State v. Smith*, 24 S.W.3d 274, 278-79 (Tenn. 2000). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Bland*, 958 S.W.2d at 659. A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005).

The defendant contends that the State has not established premeditation for the murder or any of the attempted murders. Specifically, he contends that premeditation was not established for the murder because his use of a deadly weapon, the shooting of the victim multiple times, and his fleeing of the scene and failing to alert authorities do not without more show premeditation. He further asserts that the State has not established he acted with premeditation in the attempted homicides and that the State did not establish that the defendant shot at either Mr. Moore or Mr. Hall, as Mr. Moore and Mr. Hall did not testify that the defendant shot at them.

First degree murder is a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2010). A premeditated act is:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). Premeditation is a question of fact for the jury to determine in light of all the evidence. *State v. Dickson*, 413 S.W.3d 735, 746 (Tenn. 2013). Premeditation may be proven by circumstantial evidence. *State v. Davidson*, 121 S.W.3d 600, 614-15 (Tenn. 2003). "Circumstances that may support a finding of premeditation include: 'the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing.'" *Dickson*, 413 S.W.3d at 746 (quoting *Bland*, 958 S.W.2d at 660). This list is not exhaustive, however. *Davidson*, 121 S.W.3d at 615. Evidence regarding the nature of the killing or evidence establishing a motive for the killing may provide a basis for the inference that the act was premeditated. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). Evidence that repeated blows were administered or that the type of killing required "effort, time, and intimate contact" may lead to an inference of premeditation, although repeated blows are not sufficient without more to establish premeditation. *Id.* "Under *Bland*, shooting a retreating victim alone provides circumstantial evidence of premeditation." *Dickson*, 413 S.W.3d at 746.

Applying the legal principles above, we conclude there was more than adequate proof of premeditation. Evidence at trial established that the defendant and the victim got into an

argument the night before the crime because the victim had said his name was "Nappy," a term that the defendant felt was disrespectful to members of his gang. Ms. Mallory testified that the defendant returned to the apartment where the argument had taken place later in the night accompanied by two men, but he was turned away. He then waited until after 12:00 p.m. the next day. He walked back and forth next to the apartment, and then he knocked on the door. Ms. Coward testified that when the victim opened the door, the defendant referenced their dispute by asking the victim about his name. Mr. Moore testified that the defendant asked who was in the house. Mr. Williams and Mr. Moore testified that the defendant's weapon appeared to malfunction when he first attempted to fire it. The defendant then fixed the weapon and proceeded to fire at the victim, killing him. Mr. Williams testified that the unarmed victim was retreating, and medical evidence established that almost all of the victim's wounds entered from the back. The victim was shot ten times. The defendant then turned his weapon on Mr. Williams and Mr. Moore and fired multiple times. Ms. Coward and Mr. Hall, both unarmed, tried to retreat up the stairs. The defendant pursued them, and Ms. Coward heard the defendant attempt to fire his weapon as it was pointed at them. Evidence showed that the cellular telephone the defendant had been using at the time of the crime was in the area of the crime scene at 12:22 p.m., was leaving the area at 12:38 p.m., and was subsequently destroyed or rendered inoperable.

While the defendant is correct that repeated blows, failure to report the crime, and use of a deadly weapon do not individually establish premeditation, *see State v. Brown*, 836 S.W.2d 530, 541-43 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992); *State v. Tune*, 872 S.W.2d 922, 925 (Tenn. Crim. App. 1993), in this case, the circumstances of the crime, taken together, abundantly establish premeditation. The State introduced evidence establishing a dispute which motivated the killing. Evidence also showed that prior to the actual crimes, the defendant attempted to return to the apartment where the dispute took place. There was a considerable lapse of time that could support an inference of premeditation. The defendant used a deadly weapon on unarmed victims. He shot both the homicide victim and Mr. Williams multiple times. The homicide victim was retreating and unarmed, as were Ms. Coward and Mr. Hall. From the testimony that the defendant asked who was in the house before he started shooting, the jury could draw the inference that his crimes against the attempted murder victims were also premeditated. Although Mr. Moore did not testify that the defendant was trying to shoot him, the jury was entitled to credit Mr. Williams's testimony that he jumped in front of his brother and saved him from being shot. Likewise, while Mr. Hall refused to testify regarding the events, the testimony of the other witnesses that the defendant chased Mr. Hall and attempted to shoot him is sufficient to support the conviction. After the crimes, the defendant apparently destroyed the phone he had used in the vicinity of the crime scene. The evidence, seen in the light most favorable to the State, is sufficient to support the homicide convictions. We also conclude that the evidence is sufficient to allow a rational trier of fact to conclude that the defendant employed

-14-

a firearm while committing the offense of attempted first degree murder against Mr. Williams. Accordingly, the defendant is not entitled to relief.

## II. Motion for Mistrial

The defendant next objects to the trial court's denial of his motion for a mistrial made when Ms. Mallory directed comments at the defendant from the audience while Ms. Coward was at the stand. The defendant asserts that this outburst precluded a fair trial before an impartial jury. He also contends that Ms. Mallory's reference to the defendant ruining "many lives" would have been interpreted by the jury as a reference to other criminal conduct and that Ms. Mallory's outburst was planned.

A mistrial exists "to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). A mistrial should be declared only upon a showing of manifest necessity; that is, when the trial cannot continue without a miscarriage of justice. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). The party seeking the mistrial bears the burden of establishing manifest necessity. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). The denial of a motion for a mistrial rests in the sound discretion of the trial court. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). In determining whether there has been an abuse of discretion, the reviewing court may look to: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

We conclude that, although Ms. Mallory's comments were inappropriate and disruptive, the trial court did not abuse its discretion in denying the motion for a mistrial. First, Ms. Mallory's comments were not solicited by the State but came from an emotional witness who had finished testifying. Second, the trial court gave appropriate curative instructions. Finally, the State presented overwhelming proof that the defendant committed the crimes. Ms. Mallory's statements were primarily invective against the defendant and did not put any extraneous evidence in front of the jury. Her outburst consisted of epithets and an expression of her desire for retribution. The defendant's claim that the jury interpreted the comment regarding "many" ruined lives to refer to prior criminal behavior rather than to the numerous victims of the case is purely speculative, and he has not met the burden of showing that there was a manifest necessity for a new trial. Accordingly, we conclude there was no abuse of discretion.

## III. Prior Inconsistent Statement

The defendant next objects to the admission of Mr. Hall's recorded statements into

evidence on the basis that the statements were hearsay because the requirements of Tennessee Rules of Evidence 613(b) and 803(26) were not met. Specifically, he objects that the statements were not inconsistent with the trial testimony and that the witness did not deny or equivocate regarding making the statements.

This court has previously noted a conflict in the standard of review applied to hearsay determinations. In *State v. Thomas Fancher Greenwood*, we observed that the trial court's determination that a statement was hearsay was reviewed for an abuse of discretion in *Pylant v. State*, 263 S.W.3d 854, 871 n. 26 (Tenn.2008) but reviewed de novo as a question of law in *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008). *State v. Thomas Fancher Greenwood*, No. M2013-01924-CCA-R3-CD, 2014 WL 6609308, at *35 n.6 (Tenn. Crim. App. Nov. 21, 2014). This conflict has been settled by the Tennessee Supreme Court in *Edward Thomas Kendrick, III v. State*, __ S.W.3d __, 2015 WL 240484, at *23 (Tenn. Jan. 16, 2015). In *Kendrick*, the court held that a trial court's findings of fact or credibility determinations underlying a decision to admit or exclude hearsay are binding on an appellate court unless the evidence preponderates against them. *Id.* The appellate court reviews de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Id.* We review for abuse of discretion the determination to exclude otherwise admissible hearsay based on relevance or a determination that the probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. *Id.*

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and it is generally inadmissible. Tenn. R. Evid. 801(c), 802. However, Tennessee Rule of Evidence 803 removes certain substantive evidence from exclusion under the hearsay rule. Tennessee Rule of Evidence 803(26) permits prior inconsistent statements of a testifying witness to be admitted under certain conditions. First, the statement must be "otherwise admissible under Rule 613(b)." Furthermore, the statement must satisfy certain conditions:

> (A) The declarant must testify at the trial or hearing and be subject to cross-examination concerning the statement.
>
> (B) The statement must be an audio or video recorded statement, a written statement signed by the witness, or a statement given under oath.
>
> (C) The judge must conduct a hearing outside the presence of the jury to determine by a preponderance of the evidence that the

prior statement was made under circumstances indicating trustworthiness.

The Advisory Commission Comment clarifies that the purpose in allowing such inconsistent statements as substantive evidence is "to address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party, for example."

In this case, Mr. Hall was testifying at trial and subject to cross-examination, the statement was a recording, and the judge concluded by a preponderance of the evidence that it was made under circumstances indicating trustworthiness. Accordingly, the admissibility turns on whether the statement could properly come into evidence under Rule 613(b), as required by Rule 803(26).

Tennessee Rule of Evidence 613(b) permits the use of extrinsic evidence of prior inconsistent statements for the purpose of impeachment. The Rule provides:

> Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require.

Tenn. R. Evid. 613(b). Extrinsic evidence of a prior consistent statement is not admissible under this Rule. *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998). The defendant claims first that Mr. Hall's statements at trial were not inconsistent with his statements in the recording. At trial, Mr. Hall was asked if he witnessed an event the day of the shooting and responded, "Not that I remember." He then testified that he did not believe something might have happened which he did not recall. Mr. Hall further elaborated that, while he recalled speaking to detectives, he just told detectives "what I heard" from those who witnessed the event. The trial court concluded that parts of the recording could be admitted because they were inconsistent with the trial testimony in that Mr. Hall's recorded statements indicated that he had witnessed the events himself and had not merely heard them from others present. We conclude that the trial court did not err in this factual determination.

Although the defendant cites to *State v. Ackerman* for the premise that "lack of memory . . . does not qualify as an inconsistency," we note that the holding in *Ackerman* rested also on the alternate ground that the recording was mistakenly admitted in its entirety. *State v. Ackerman*, 397 S.W.3d 617, 639 (Tenn. Crim. App. 2012) (stating that, assuming there was an inconsistency in the witness's lack of memory, the entire video should not have

been admitted) *overruled on other grounds by State v. Henry Floyd Sanders*, __S.W.3d __, No. M2011-00962-SC-R11-CD, 2014 WL 5801665, at \*13 (Tenn. Nov 10, 2014). Moreover, the comments to 803(26) make it clear that the Rule is intended to "address circumstances where witnesses suddenly claim a lack of memory in light of external threats of violence which cannot be directly attributed to a party." Tenn. R. Evid. 803(26) 2009 Advisory Comm'n Cmt.; *see also State v. Marlo Davis*, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131, at \*14 -15 (Tenn. Crim. App. May 21, 2013) (rejecting argument that memory loss is the absence of a statement rather than an inconsistent statement), *perm. app. granted* (Tenn. Nov. 13, 2013); *State v. Michael Wayne Davis*, M2010-02108-CCA-R3-CD, 2013 WL 105172, at \*9 (Tenn. Crim. App. Jan. 9, 2013) (concluding that the trial court did not err in its determination that a witness's testimony that he did not witness anything was inconsistent with the recorded statement detailing what he witnessed) *perm. app. denied* (Tenn. Apr. 11, 2013). We conclude that Mr. Hall's testimony at trial that he was experiencing a sudden lack of memory was inconsistent with the recording, and therefore it satisfies the requirement in Rule 613 that the prior statement be inconsistent.

The defense also argues that Mr. Hall did not satisfy Rule 613(b)'s requirement that he deny making the statements or equivocate regarding having made them. The language of the Rule itself does not require the witness to deny having made the inconsistent statement. Instead, the Rule requires "an opportunity to explain or deny" the statement. *Id.* However, the Tennessee Supreme Court, in *State v. Martin*, concluded that under Rule 613(b), "[e]xtrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." *Martin*, 964 S.W.2d at 567. The Advisory Commission Comment to the 2003 Amendment to Rule 613(b) notes that the words "and until" were added to the Rule "to incorporate the holding in *State v. Martin*, 964 S.W.2d 564 (Tenn. 1998): 'extrinsic evidence remains inadmissible until the witness either denies or equivocates as to having made the prior inconsistent statement.'" Accordingly, it appears that the requirement that the witness deny or equivocate regarding having made the statement has been incorporated into the Rule.

The State, recognizing that Mr. Hall neither denied making the statements nor equivocated regarding them, argues that the issue is waived. A party may waive an objection to hearsay evidence. *State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000). If a party fails to raise a timely objection to hearsay evidence, then the evidence becomes admissible and may be considered as substantive evidence by the jury. *Id.* (concluding that prior inconsistent statement, which under the rules in effect at the time could not be admitted as substantive evidence, was properly considered as substantive evidence in the absence of an objection). Here, the State contends that the defendant has waived the argument that the statement is inadmissible under Rule 803(26) because the defense invited the error. Specifically, the State notes that when the prosecution attempted to ask Mr. Hall about what he had told detectives,

the defense objected because Mr. Hall had previously testified that any information he gave detectives about the crimes was just what he had heard, i.e., hearsay. The State submits that this objection prevented the prosecution from ensuring that Mr. Hall either denied or equivocated regarding making the statements.

After the prosecutor asked Mr. Hall what he had told the detectives and Mr. Hall answered, "You know," defense counsel objected that the testimony would be hearsay based on Mr. Hall's testimony that he did not have firsthand knowledge of the facts he told the detective. The trial court, however, did not sustain this objection during the ensuing bench conference, and it then asked the State if the State intended to rely on 803(26). The defense objected to the statement being admitted under Rule 803(26). Accordingly, we decline to conclude that the issue is waived or that the prosecution was somehow unable to ascertain if Mr. Hall acknowledged having made the specific statements or denied or equivocated regarding having made them.

In examining the issue, we note that the rationale underlying the decision in *Martin* does not extend to prior inconsistent statements which are admitted as substantive evidence. In holding that extrinsic evidence of an inconsistent statement is inadmissible unless the witness denies having made the statement or equivocates, the court in *Martin* noted that "[t]he unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness[] during trial." *Martin*, 964 S.W.2d at 567. The court further noted that "[t]ime is saved" if the witness acknowledges having made the statement and that giving the witness the opportunity to acknowledge the statement prior to the introduction of extrinsic evidence "lessens the risk that a jury will consider the evidence as substantive evidence." *Id.*

When extrinsic evidence of a prior inconsistent statement is admitted as impeachment evidence only, the witness's acknowledgment that the statement was made functions as impeachment itself and renders the extrinsic evidence cumulative, as noted in *Martin*. The same cannot be said when the evidence is sought to be admitted for its substantive value. Neither is there any longer a risk that the evidence will be used improperly as substantive evidence by the jury. Nevertheless, when a party seeks to admit the evidence under Rule 803(26), we are left with the anomalous result that if the party at trial denies having made the inconsistent statement, the inconsistent statement becomes admissible substantive evidence (subject to the other conditions of admissibility), whereas when the party acknowledges having previously made an inconsistent statement, such evidence may only serve to impeach the party and does not come in as substantive evidence, since it cannot be admitted as extrinsic evidence under Rule 613(b). Since the addition of Subsection (26) in 2009, this court has on several occasions excluded hearsay evidence because the witness did not deny having made the statement and it therefore did not meet the requirements of 613(b) or the

requirement in 803(26) that the statement be admissible under 613(b). *See Ackerman*, 397 S.W.3d at 639 (concluding that the statements were not admissible because the witness "unequivocally admitted making the statements" and because the statements were not inconsistent with her trial testimony); *see also State v. Devonta Amar Cunningham*, No. M2012-02203-CCA-R3-CD, 2015 WL 173495, at *13 (Tenn. Crim. App. Jan. 14, 2015) (concluding that court did not err in denying admission of prior inconsistent statements as substantive evidence when the witness acknowledged having made the statements); *State v. Larry D. Rothwell*, No. E2011-01733-CCA-R3-CD, 2013 WL 3155834, at *11 (Tenn. Crim. App. June 20, 2013) (concluding that trial court did not err in refusing to admit extrinsic evidence of a prior inconsistent statement as substantive evidence where the witness admitted the inconsistency), *perm. app. denied* (Tenn. Oct. 16, 2013). Accordingly, it appears that, under the current Rules, the evidence should not have been admitted until Mr. Hall denied making the statements or equivocated regarding making the statements.

While noting the incongruity above, we ultimately conclude that, even if the evidence in this case was admitted in error, the error was harmless. Mistakenly admitted hearsay evidence is subject to harmless error analysis. *See State v. Taylor*, 240 S.W.3d 789, 802 (Tenn. 2007). A judgment shall not be set aside "unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008).

The recording of Mr. Hall contained only evidence which was cumulative of the testimony of other witnesses at trial. Mr. Hall told police that, as Ms. Coward testified, the defendant mentioned the dispute regarding a name prior to shooting. Mr. Hall's prior statement also confirmed Mr. Williams's and Mr. Moore's testimony that the defendant attempted to fire his weapon but was unable to do so at first. His statement to police that the defendant chased him and Ms. Coward up the stairs and attempted to fire his weapon was also cumulative of other witness testimony. The fact that the trial court permitted the jury to hear the recording again based on its quality, after cautioning the jury not to give the evidence undue weight, does not change our analysis. *See State v. Jenkins*, 845 S.W.2d 787, 793 (Tenn. Crim. App. 1992). The State presented the testimony of three witnesses who saw the shooting. It also introduced evidence tending to show that the defendant was in the area at the time of the crime and that he destroyed his cell phone immediately after. The physical evidence regarding the nine millimeter cartridge casing confirms the testimony of witnesses that the gun initially jammed. The State's case was particularly strong, the evidence contained in the prior inconsistent statement was merely cumulative, and any error in admitting the evidence was therefore harmless.

## IV. Sentencing

The defendant's final issue is a challenge to the length of his sentences for the attempted murder convictions and the imposition of partial consecutive sentences. While Tennessee Code Annotated section 40-35-401(d) states that an appellate court reviewing the sentence length, range or the manner of service shall conduct a *de novo* review on the record with a presumption of correctness, the Tennessee Supreme Court concluded that this standard of review was in essence abrogated by the 2005 amendments to the Sentencing Act. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Accordingly, this court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. When the sentence is within range and in harmony with the purposes and principles of sentencing, this court may not modify a sentence "'even if we would have preferred a different result.'" *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008) (quoting *State v. Pike*, 978 S.W.2d 904, 927 (Tenn. 1998)). The defendant bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 707 (upholding sentence even though single enhancement factor was mistakenly applied). A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing as provided by statute." *Id.*

The defendant does not challenge the trial court's application of enhancement factors, but he contends that the trial court's decision to sentence him to twenty-five years for each of the attempted murder convictions is greater punishment than that deserved for the offense and not the least severe measure necessary to achieve the purposes of sentencing. *See* T.C.A. § 40-35-103(2), (4). He alternatively asks for a reduction in his sentences involving those victims who were not actually injured during the crime. The trial court sentenced the defendant to the maximum in the correct range. It stated on the record that it had considered the purposes and principles of sentencing in arriving at the sentence. It also went through each enhancement factor which it had applied and looked at and rejected the statutory mitigating factors. During the hearing, the trial court emphasized the defendant's violent reaction to very slight provocation, the fact that the victim was shot in the back, and the fact that some of the crimes were committed against victims who were essentially bystanders. We conclude that the trial court did not abuse its discretion or ignore the principles of sentencing when it sentenced the defendant to the maximum in the appropriate range.

The defendant also contends that the trial court erred in finding the factors required by *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995), and he claims that the imposition of consecutive sentences was in any event in violation of the purposes and principles of sentencing. Tennessee Code Annotated section 40-35-115(b) states that a trial court may order consecutive sentences if it finds by a preponderance of the evidence that one of seven enumerated factors applies. The trial court found that the only factor which supported consecutive sentencing was that the defendant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). In *State v. Pollard*, the Tennessee Supreme Court concluded that, although consecutive sentencing was unaffected by the 2005 amendments, appellate review of consecutive sentencing would nevertheless be conducted under an abuse of discretion standard, accompanied by a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). *Pollard* noted that, under *Bise*, the trial court must articulate the reasons for imposing consecutive sentencing in order for the abuse of discretion standard to apply. *Id.* at 861. *Pollard* also concluded that the requirement, first articulated in *State v. Wilkerson*, that the trial court must further find that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts" was still applicable despite the new abuse of discretion standard of review. *Id.* at 863; *Wilkerson*, 905 S.W.2d at 938. When the trial court fails to articulate the *Wilkerson* findings in the record, the appellate court no longer applies the presumption of reasonableness or defers to the trial court's discretion. *Pollard*, 432 S.W.3d at 863-64. Instead, the court may then choose between conducting a *de novo* review or remanding to the trial court for the appropriate findings. *Id.* at 864.

Because the trial court here made the required findings on the record, we review for an abuse of discretion. The trial court articulated its reasons for imposing consecutive sentences and found that the *Wilkerson* factors applied, citing particularly to the fact that the defendant committed the crimes against multiple victims, four of whom had no involvement with the dispute between the victim and defendant. While it is true that the defendant was already sentenced to a lengthy confinement, we cannot say that it was beyond the discretion of the trial court to impose additional prison time for the separate and unprovoked crimes committed against the victims of the attempted homicides. We conclude the trial court did not abuse its discretion. Because the trial court stated on the record that it also considered the purposes and principles of sentencing when imposing the sentence, we likewise reject the defendant's argument that the sentences should be reversed because they are in conflict with these principles.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE